# IN THE SUPREME COURT OF TEXAS

═══════════════

No. 19-0634

═══════════════

RAMONA ROGERS, M. D., MODESTO ZAMORANO, STEPHANIE CUMPIAN, ROLANDO
FLORES, HECTOR ONTIVEROS, PRISCILLA NIETO, SONIA HERNANDEZ-KEEBLE,
BLAS ORTIZ, JR., DAVID MORON, M. D., JAIME FLORES AND RIO GRANDE STATE
CENTER, PETITIONERS,

v.

DAVID SAXON BAGLEY, INDIVIDUALLY AND AS REPRESENTATIVE OF THE
ESTATE OF JEREMIAH RAY BAGLEY, RESPONDENT

═══════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

═══════════════════════════════════

**Argued February 2, 2021**

JUSTICE HUDDLE delivered the opinion of the Court.

The questions before us are (1) whether claims asserted against a state mental health facility and its employees arising from the death of a patient, pleaded as claims under 42 U.S.C. § 1983, are health care liability claims under the Texas Medical Liability Act (TMLA); and (2) if so, whether section 1983 preempts the TMLA's requirement to timely serve an expert report. We hold that the claims are health care liability claims subject to the TMLA and that section 1983 does not preempt the TMLA's expert-report requirement. We therefore reverse the court of appeals' judgment and remand the case to the trial court for proceedings consistent with this opinion.

## I. Background

David Bagley sued Rio Grande State Center (RGSC) and several of its employees after the death of his thirty-seven-year-old son, Jeremiah Bagley. Jeremiah, who had a history of mental illness, was committed to RGSC, a state mental health facility. While there, Jeremiah was involved in multiple altercations with other patients. After one such altercation, Jeremiah was assigned one-to-one supervision. The incident that led to Jeremiah's death began when Jeremiah physically struck his one-to-one monitor. Five psychiatric nurse assistants (PNAs) intervened to restrain him and administer injectable anti-psychotic and sedative drugs, Olanzapine and Diphenhydramine.

After Jeremiah calmed, he walked to his room, but he soon became agitated, disoriented, pale, and incoherent. Minutes later, Jeremiah went into cardiac arrest. RGSC staff performed CPR and called EMS. When EMS arrived, they administered CPR using an automated chest compression device. EMS transported Jeremiah to a hospital, where he was pronounced dead.

An autopsy revealed Jeremiah had several fractured vertebrae, cracked ribs, a lacerated spleen, and contusions on his head, shoulders, back, and chest. The stated cause of death was "excited delirium due to psychosis with restraint-associated blunt force trauma."

David Bagley sued individually and as the representative of Jeremiah's estate. He named RGSC itself, along with ten individual defendants: the five PNAs involved in the incident, four RGSC supervisors, and Jeremiah's treating doctor.[1] As to RGSC, Bagley alleged negligence under the Texas Tort Claims Act for "dispens[ing] and/or administer[ing] various drugs proximately causing [Jeremiah's] personal injury and death." Against the individual defendants, Bagley

---

[1] The individual defendants in the trial court are Hector Ontiveros, Modesto Zamorano, Stephanie Cumpian, Rolando Flores, and Priscilla Nieto (the PNAs); Sonia Hernandez-Keeble, Blas Ortiz, Jr., David Moron, M.D., and Jaime Flores (the RGSC supervisors); and Ramona Rogers, M.D. (Bagley's treating physician).

2

asserted claims under 42 U.S.C. § 1983, alleging (1) excessive force in violation of the Fourth Amendment against the PNAs, (2) deliberate indifference by the supervisors in their training and supervision of the PNAs, and (3) deliberate indifference as to Bagley's medical care against Dr. Ramona Rogers.

In their respective original answers, the defendants all referenced "the provisions of Chapter 74 of the Texas Civil Practice and Remedies Code." Chapter 74 is the Texas Medical Liability Act, which governs health care liability claims (HCLCs) and requires that the plaintiff, to avoid dismissal, serve an expert report addressing liability and causation as to each defendant within 120 days after the defendant files an original answer. TEX. CIV. PRAC. & REM. CODE § 74.351(a). Bagley served no such expert report.

After the 120-day deadline passed, RGSC amended its answer to state: "Plaintiff's claims against Defendant RGSC are health care liability claims subject to the substantive and procedural requirements of the Texas Medical Liability Act ('TMLA'), set forth in Chapter 74 Texas Civil Practice and Remedies Code." The individual defendants made analogous amendments.

All defendants jointly moved to dismiss Bagley's claims for failure to serve an expert report under section 74.351(b).[2] In response, Bagley argued that his claims are not HCLCs and, even if they were, the TMLA's expert-report requirement is preempted by section 1983. Bagley later supplemented his response with a copy of the autopsy and the Inspector General's report of

---

[2] Section 74.351(b) provides that, when a plaintiff fails to serve an expert report by the 120-day deadline, on the defendant's motion the court "shall" enter an order that (1) "awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider," and (2) "dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim." TEX. CIV. PRAC. & REM. CODE § 74.351(b).

the incident, arguing the defendants "wholly failed to show that TMLA has any application to Plaintiff's case."

At the hearing on the motion to dismiss, Bagley announced his nonsuit of the negligence claim against RGSC. The trial court denied the motion to dismiss, and all defendants (including nonsuited RGSC) filed an interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9).

The court of appeals first held that RGSC was a proper party to the appeal despite being nonsuited because its motion to dismiss with prejudice and for attorney's fees and costs was pending at the time of the nonsuit. 581 S.W.3d 362, 367 (Tex. App.—Corpus Christi–Edinburg 2019). The court concluded that all of Bagley's claims were HCLCs, but it held that the expert-report requirement of the TMLA was preempted by section 1983. *Id.* at 369, 374. Both Bagley and the defendants petitioned for review.

## II. Analysis

In the 1970s, the Texas Legislature found that health care liability claims were increasing "inordinately," adversely affecting the availability and affordability of adequate medical malpractice insurance and driving up the costs of medical care for patients. *See* Medical Liability and Insurance Improvement Act of Texas, 65th Leg., R.S., ch. 817, § 1.02(a)(1), (4), (8), 1977 Tex. Gen. Laws 2039. In response to this "medical malpractice insurance crisis," the Legislature enacted the predecessor to the TMLA, the Medical Liability and Insurance Improvement Act (MLIIA). *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011) (citing MLIIA § 1.02(a)(5)–(6)). The legislation sought to "reduce [the] excessive frequency and severity of health care liability claims . . . in a manner that [would] not unduly restrict a claimant's rights any more than necessary to deal with the crisis." MLIIA § 1.02(b)(1)–(3).

4

In 2003, the Legislature replaced the MLIIA with the TMLA, repeating its findings and statements of purpose. *Scoresby*, 346 S.W.3d at 552 (citing Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 10.11, 2003 Tex. Gen. Laws 847, 864–82, 884–85). The TMLA effectuates the Legislature's goal of "deter[ring] frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 74.351(a).

In this case, Bagley argues that his claims are outside the scope of the TMLA—and he was thus not required to serve an expert report—because he pleaded them under 42 U.S.C. § 1983.[3] He further argues that even if his claims are within the TMLA's scope, section 1983 preempts the TMLA because the two conflict and, under the Supremacy Clause of the United States Constitution,[4] the state law gives way to the federal. RGSC and the individual defendants assert the TMLA applies, an expert report was required because Bagley's claims are HCLCs under the TMLA, and section 1983 does not preempt the TMLA's expert-report requirement. We agree with RGSC and the individual defendants.

### A. Bagley's claims are health care liability claims.

Our threshold question is whether Bagley's claims are HCLCs subject to the TMLA, including the expert-report requirement in section 74.351. HCLCs have three elements: (1) the defendant is a health care provider[5] or physician; (2) the claimant's cause of action is for treatment,

---

[3] 42 U.S.C. § 1983 provides individuals with a cause of action against state actors for violations of the United States Constitution under color of state law. 42 U.S.C. § 1983; *see Nieves v. Bartlett*, 139 S. Ct. 1715, 1721 (2019) (stating that section 1983 "provides a cause of action for state deprivations of federal rights").

[4] U.S. CONST. art. VI, cl. 2.

[5] "'Health care provider' means any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including . . .

lack of treatment, or other claimed departure from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's alleged departure from accepted standards proximately caused the claimant's injury or death. *Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012) (citing TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13)). Bagley does not dispute the first element: each defendant meets the definition of a health care provider or physician under the statute. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12). As to the third element, Bagley alleges that each defendant's conduct proximately caused Jeremiah's death.

Whether Bagley's claims are HCLCs therefore turns on the second element—whether Bagley's section 1983 claims allege a cause of action "for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." *See id*. § 74.001(a)(13). The TMLA defines "health care" as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10). The TMLA does not define "safety," but this Court has defined it as "the condition of being 'untouched by danger; not exposed to danger; secure from danger, harm or loss.'" *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 184 (Tex. 2012) (quoting *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005)).

---

an employee, independent contractor, or agent of a health care provider or physician acting in the course and scope of the employment or contractual relationship." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(12).

6

The language of the statute and this Court's precedents demonstrate that the TMLA casts a wide net. *See Loaisiga*, 379 S.W.3d at 256 ("The broad language of the TMLA evidences legislative intent for the statute to have expansive application."). In *Loaisiga*, we held that the breadth of the TMLA "creates a rebuttable presumption that a patient's claims against a physician or health care provider based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement are HCLCs." *Id.* at 252.

*Loaisiga* also teaches that when considering whether claims are HCLCs, we focus not on how the plaintiff pleaded or labeled his claims but, rather, on whether the facts underlying the claim could support an HCLC. *Id.* at 255. "[C]laims premised on facts that *could* support claims against a physician or health care provider for departures from accepted standards of medical care, health care, or safety or professional or administrative services directly related to health care are HCLCs, regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards." *Id.* (emphasis in original).

Here, Bagley's section 1983 claims are based on the following allegations: (1) the PNAs improperly restrained Jeremiah for ten minutes with force that was objectively unreasonable and excessive to the need and forcibly injected him with medications to calm him; (2) the RGSC administrators were deliberately indifferent for failing to train and supervise the PNAs to use proper restraint techniques; and (3) Dr. Rogers, Jeremiah's treating physician, was deliberately indifferent for ignoring Jeremiah's "serious medical needs."

We agree with the court of appeals that these allegations constitute claims based on the departure from accepted standards of health care and therefore fall within the TMLA's scope. With respect to the PNAs, Bagley alleges that the PNAs "went far beyond any form of acceptable

restraint." He claims that the Inspector General's report "determined the restraint administered was not proper in any way." He alleges that "[f]ive nurses never should have been involved in the restraint, nor should a nurse attempt a restraint from the side." Finally, he alleges the PNAs "improperly restrained" Jeremiah's legs and held him down by the waist while an injection was administered. Thus, the gravamen of Bagley's claims against the PNAs is that they improperly restrained him while administering an injection.

With respect to the four supervisors, Bagley alleges they each "either failed to supervise or train" the PNAs. He alleges that the supervisors "were responsible to ensure the RGSC staff . . . were properly trained in restraints and other necessary skills for dealing with patients at the facility." And Bagley alleges that his treating physician failed to address his serious medical needs.

"[A] claim alleges a departure from accepted standards of health care if the act or omission complained of is an inseparable or integral part of the rendition of health care." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 180 (citing *Diversicare*, 185 S.W.3d at 850). Regardless of how Bagley characterizes them, at their core, his claims turn on whether the defendants adhered to the appropriate standards of care for restraining a psychiatric patient, supervising and training those who would restrain a psychiatric patient, and properly treating and administering medication to a psychiatric patient. As we have previously recognized, physical restraint, training and staffing policies, and supervision behind the use of restraint are integral components of the rendition of health care services to potentially violent psychiatric patients. *See Psychiatric Sols., Inc. v. Palit*, 414 S.W.3d 724, 725–26 (Tex. 2013) (holding that an employee's claim for injuries received while physically restraining a psychiatric patient involved acts or omissions that constitute "health care" under the TMLA); *Tex. W. Oaks Hosp.*, 371 S.W.3d at 175, 180–82 (holding that a hospital

8

employee's claim for injuries arising from a physical altercation with a violent psychiatric patient involved acts or treatment that were integral to a patient's medical care, treatment, or confinement, and therefore constitute "health care" under the TMLA); *see also Diversicare*, 185 S.W.3d at 845, 850 (holding that a nursing home resident's claim for sexual assault by another patient was an HCLC because the facility's "training and staffing policies and supervision and protection of [the patient] and other residents are integral components of [the facility]'s rendition of health care services").

Bagley's allegations regarding Jeremiah's restraint also constitute complaints that the defendants departed from *safety* standards and should be classified as HCLCs for that independent reason. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13) (HCLCs include "departure[s] from accepted standards of . . . safety"). In *Texas West Oaks Hospital*, we held that claims "predicated upon the monitoring and restraint of violent, schizophrenic patients[] implicate the safety, as commonly understood, of employees and patients." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 183–84. Again, Bagley's allegation that the restraint in this case was improper necessarily implies it did not comport with accepted standards of safety.

Bagley's claims are HCLCs for a third reason: their proof requires expert testimony. We held in *Texas West Oaks Hospital* that a claim is an HCLC "if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider." *Id.* at 182. There, we held that a hospital employee's claim against the hospital for injuries arising from a physical altercation with a patient necessarily required expert testimony. *Id.* at 175, 182. We reasoned that the claims would "require evidence on proper training, supervision, and protocols to prevent, control, and defuse aggressive behavior and altercations in

9

a mental hospital between psychiatric patients and employed professional counselors who treat and supervise them." *Id.* at 182. We further stated that "[i]t would blink reality to conclude that no professional mental health judgment [was] required to decide what those should be, and whether they were in place at the time" of the injury. *Id.* Bagley's claims similarly will require expert opinion testimony on acceptable standards for restraining a psychiatric patient.

Bagley asserts that expert testimony "may not be necessary" to prove a claim for excessive force because "[t]he jury can rely on their common sense based on the evidence." But the excessive-force claims in this case arise in the specific context of the method used to restrain a potentially violent psychiatric patient in a mental health care facility. The Fifth Circuit has expressly recognized that in cases under section 1983, expert testimony regarding use of force and proper arrest techniques and training is not within the common knowledge of jurors. *See Johnson v. Thibodaux City*, 887 F.3d 726, 737 (5th Cir. 2018) (affirming trial court's admission of expert opinions regarding arrest techniques and use of force over objection that testimony was within jury's province). Here, like in *Texas West Oaks Hospital*, the need for expert testimony independently supports our conclusion that Bagley's claims are HCLCs.

Despite the broad scope of the TMLA, Bagley argues it was not intended to apply to constitutional civil rights claims. In support of this argument, Bagley points out that the TMLA states that a cause of action is an HCLC "whether the claimant's claim or cause of action sounds in tort or contract." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). Bagley reasons that this phrase limits the scope of the TMLA to exclude constitutional claims, which Bagley contends are neither torts nor contract claims.

10

Contrary to Bagley's assertion, we do not read this phrase as a limitation. In analyzing the language of the statute, we "presume the Legislature 'chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen.'" *Cadena Comercial USA Corp. v. TABC*, 518 S.W.3d 318, 325–26 (Tex. 2017) (quoting *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011)). We aim to discern the Legislature's intent by looking first to the "plain and common meaning of the statute's words." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 177 (quoting *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003)). The conjunction "whether," by its common definition, means "alternative conditions or *possibilities*."[6] The Legislature's use of "whether" does not mean that claims *must* sound in either tort or contract to qualify as HCLCs; it merely illustrates that the claims *can* sound in tort or contract. In any event, even if we were inclined to read the phrase as a limitation, Bagley's claims would qualify. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) ("[T]here can be no doubt that claims brought pursuant to § 1983 sound in tort.").

Bagley advances the following additional arguments for why he contends the TMLA was not intended to apply to section 1983 claims: (1) the objective of the TMLA was to overhaul Texas malpractice law, not to regulate section 1983 claims; (2) nothing in the TMLA's legislative history indicates an intent to curtail a federal remedy under section 1983; and (3) the elements of a federal civil rights claim do not overlap with the elements of an HCLC. None of these arguments has merit.

---

[6] *Whether*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/whether (emphasis added) (last visited April 6, 2021).

Bagley's reliance on legislative history to establish the Legislature's supposed intent is misplaced. To determine whether the Legislature intended for the TMLA to apply to a particular claim, we focus on the text of the statute, particularly its definition of "health care liability claim." TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13). In the absence of "clear statutory language to the contrary," we presume that when the Legislature chooses broad language, "the Legislature intended it to have equally broad applicability." *Cadena Comercial USA Corp.*, 518 S.W.3d at 327. Also, as noted above, the elements of the cause of action as pleaded by Bagley do not control whether that cause of action is a health care liability claim under the statute. *See Loaisiga*, 379 S.W.3d at 255 ("Analysis of the second element—the cause of action—focuses on the facts underlying the claim, not the form of, or artfully-phrased language in, the plaintiff's pleadings describing the facts or legal theories asserted.").

All of Bagley's claims allege a departure from accepted standards of health care or safety. Therefore, we hold they are all "health care liability claims" under the TMLA. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13).

### B. Section 1983 does not preempt section 74.351 of the TMLA.

The Supremacy Clause of the United States Constitution dictates that the "Constitution, and the Laws of the United States" are "the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. When federal law and state law conflict, the inconsistent state law necessarily gives way to the federal law. *See Free v. Bland*, 369 U.S. 663, 666 (1962) ("[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.") (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 3 (1824)).

12

Whether an inconsistent state law is preempted when a plaintiff brings a federal cause of action in state court depends, generally, on whether the state law is procedural or substantive in nature. *See Felder v. Casey*, 487 U.S. 131, 138 (1988). But those labels are not themselves determinative. The essential question is whether the state law stands as an obstacle to the federal law such that enforcement of the state law will frequently and predictably produce different outcomes based solely on whether the claim is asserted in state or federal court. *Id.* The Supreme Court of the United States has said that, while "[s]tates may establish the rules of procedure governing litigation in their own courts[,] . . . where state courts entertain a federally created cause of action, the 'federal right cannot be defeated by the forms of local practice.'" *Id.* (quoting *Brown v. W. Ry. of Ala.*, 338 U.S. 294, 296 (1949)).

Bagley relies primarily on *Felder* to support his preemption argument. *Felder* involved a Wisconsin statute that required written notice of a claim against a state governmental subdivision, agency, or officer to be provided to the government within 120 days of the alleged injury. *Id.* at 136. The statute further required the claimant to submit an itemized statement of the relief sought. *Id.* at 136–37. The governmental subdivision, agency, or officer then had 120 days to either grant or deny the requested relief. *Id.* at 137. If the claim was denied, the claimant was required to bring suit within six months of receiving notice of the denial. *Id.*

The Supreme Court held the Wisconsin statute was preempted because it undermined the "uniquely federal remedy" provided under section 1983. *Id.* at 141. The Court reasoned that the Wisconsin statute erected a hurdle to recovery that was not "a neutral and uniformly applicable rule of procedure; rather, it [was] a substantive burden imposed only upon those who seek redress for injuries resulting from the use or misuse of governmental authority." *Id.* In this sense, the

13

Court found the Wisconsin statute discriminated against section 1983 claims. *Id.* Whereas Wisconsin law ordinarily afforded victims of intentional torts two years to file their claims, the statute gave section 1983 claimants only four months. *Id.* at 141–42. Finally, the Court observed that the Wisconsin statute operated as an exhaustion requirement by forcing claimants to first seek redress directly from the governmental actor before filing suit. *Id.* at 142. The Court reasoned that "Congress never intended that those injured by governmental wrongdoers could be required, as a condition of recovery, to submit their claims to the government responsible for their injuries." *Id.* For all these reasons, *Felder* held section 1983 was inconsistent with—and therefore preempted—the Wisconsin statute.

While Bagley argues *Felder* is controlling, RGSC and the individual defendants argue this case is more like *In re GlobalSanteFe Corp.*, 275 S.W.3d 477 (Tex. 2008). In that case, the plaintiff sued in state court under the Jones Act[7] for alleged injuries from exposure to silica while working aboard a maritime vessel. Like the expert-report requirement here, Chapter 90 of the Civil Practice and Remedies Code requires a claimant alleging silica-related injuries to serve an expert report in the early stages of the litigation. TEX. CIV. PRAC. & REM. CODE § 90.004. The plaintiff failed to serve an expert report and argued that the expert-report requirement was preempted by the Jones Act. *GlobalSanteFe*, 275 S.W.3d at 482.

We concluded that the expert-report requirement was not preempted because it did not require anything different from plaintiffs than what would have been required of them in federal

---

[7] The Jones Act is a federal statute that provides a cause of action to seamen injured in the course of their employment. 46 U.S.C. § 30104.

court.[8] *Id.* at 486–87. In so holding, we noted that "[n]othing in the Jones Act exempts a seaman claiming a silica-related disease from establishing, through reliable medical proof, that he in fact suffers from such a disease." *Id.* at 486. We reasoned that because reliable expert testimony would be required in both state and federal court, the state expert-report requirement was not an extra substantive burden on plaintiffs in state courts. *Id.* at 486–87. We said that "[w]e see no basis for holding that Texas law generally governing the admission of expert testimony, which draws so heavily from federal law, is preempted by the Jones Act." *Id.* at 487. And we concluded that "Texas courts are not expected to abandon all their regular rules of practice and procedure and to adopt federal rules in a case simply because a Jones Act claim is alleged." *Id.* at 489.

We find the TMLA's expert-report requirement more similar to the expert-report requirement in *GlobalSanteFe* than the statutory exhaustion procedure in *Felder*. Here, as in *GlobalSanteFe*, Texas law requires service of an expert report in the preliminary stage of the litigation. *Compare* TEX. CIV. PRAC. & REM. CODE § 74.351, *with GlobalSanteFe*, 275 S.W.3d at 480–81 (citing TEX. CIV. PRAC. & REM. CODE §§ 90.004, .006). And like the Jones Act plaintiff in *GlobalSanteFe*, Bagley ultimately would have to establish the substance of what is required in the report whether he filed his claims in federal court or state court. In other words, the TMLA's expert-report requirement merely requires an advance summary of the same evidence Bagley would have to present to prevail at trial, regardless of whether he sued in federal or state court. Guided by *GlobalSanteFe*, we conclude that requiring Bagley to serve a report providing a fair

---

[8] We did, however, conclude that a different provision of Chapter 90, which required claimants to prove a minimal level of physical impairment to prevail, conflicted with the Jones Act. *GlobalSanteFe*, 275 S.W.3d at 489; *see* TEX. CIV. PRAC. & REM. CODE § 90.004(b)(2). Because the Jones Act did not have a similar injury threshold, we held that the minimal-impairment requirement of Chapter 90 was preempted by the Jones Act and should not be applied in Jones Act cases. *GlobalSanteFe*, 275 S.W.3d at 489–90.

15

summary of an expert's opinions on a standard of care, its breach, and causation does not create an additional substantive hurdle or otherwise conflict or interfere with federal law. It affects only the timing in which the proof, which would be required in both federal and state court, must be disclosed. *See Passmore v. Baylor Health Care Sys.*, 823 F.3d 292, 296–98 (5th Cir. 2016) (characterizing section 74.351 as a procedural requirement and, per the *Erie* doctrine, rejecting its applicability in federal court in favor of federal procedural rules).

The TMLA's expert-report requirement is also different from the Wisconsin scheme at issue in *Felder* in other important respects. Unlike the Wisconsin statute, which burdened only individuals seeking redress from governmental defendants, section 74.351 applies generally to all health care liability claims, regardless of whether the defendant is a government actor. *Compare* TEX. CIV. PRAC. & REM. CODE § 74.351, *with Felder*, 487 U.S. at 141–42. Additionally, section 74.351 does not alter the statute of limitations or erect an exhaustion requirement before one can file a section 1983 claim—section 74.351 applies only after suit has been filed.

The court of appeals held that the TMLA's expert-report requirement is preempted because it "burdens a state court § 1983 claimant in a manner that can be dispositive." 581 S.W.3d at 374. But asking whether a state-court procedure that is inapplicable in federal court *may* in some circumstances be dispositive is not the right inquiry. *See Robertson v. Wegmann*, 436 U.S. 584, 593 (1978) ("A state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation."). The inquiry, instead, is whether the state statute would "frequently and predictably produce different outcomes in § 1983 litigation based solely on whether the claim is asserted in state or federal court." *Felder*, 487 U.S. at 138. The expert-report requirement in section 74.351 would not.

16

Bagley argues that section 74.351, like the statute in *Felder*, would limit claimants' recoveries against the government. Section 1983 provides a cause of action for the deprivation of federal civil rights by those wielding state authority. *Felder*, 487 U.S. at 139. Section 74.351—the purpose of which is to deter frivolous claims—does not prevent claimants from asserting that cause of action. *See Scoresby*, 346 S.W.3d at 554; *see also Loaisiga*, 379 S.W.3d at 263 (noting that review of the claimant's expert report for adequacy is "a preliminary determination designed to expeditiously weed out claims that have no merit"). It merely provides that, if the claim falls within the statutory definition of an HCLC, after the claim is filed, and without regard to whether the claim is against a government defendant, the plaintiff must serve an expert report to demonstrate in the early stages of the litigation that he can meet the basic substantive proof requirements the claimant would be required to prove at trial. For these reasons, we reject Bagley's proposition that section 74.351 obstructs section 1983 claims.

We also conclude that enforcement of section 74.351 will not "frequently and predictably" produce a different outcome depending on whether a section 1983 claim is brought in state or federal court. *See Felder*, 487 U.S. at 138. Section 74.351 defines the required expert report as a written report that "provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). Any claimant asserting a health care liability claim, even one arising under section 1983, would need to present evidence of these same elements to prevail at trial, regardless of whether he chooses to sue in federal or state court. For example, Bagley's excessive-force claim will require evidence regarding the applicable

17

standard of care—what amount of force is considered objectively reasonable within the context of restraining a psychiatric patient with Jeremiah's history. *See Bush v. Strain*, 513 F.3d 492, 500–01 (5th Cir. 2008) (stating that an excessive-force claim under section 1983 requires proof that the use of force was "excessive to the need" and "objectively unreasonable"); *see also Tex. W. Oaks Hosp.*, 371 S.W.3d at 180 (holding that physical restraint of a psychiatric patient is an integral part of health care). Bagley's claim will require evidence that the PNAs failed to meet that standard by using excessive force (force greater than that which is objectively reasonable) when they restrained Jeremiah. And Bagley's claim will require evidence that the PNAs' alleged departure from the standard of care (their use of excessive force) caused Jeremiah's injuries and death. The same proof would be required at trial regardless of whether section 74.351 applied.

Because the TMLA's expert-report requirement would not cause reliably different outcomes in section 1983 cases brought in state and federal court, we hold that section 74.351 is not preempted by section 1983.[9]

## C.  RGSC is a proper party to the appeal.

Bagley contends RGSC is not a proper party to this appeal because Bagley nonsuited his claims against RGSC before the trial court ruled on its motion to dismiss. Bagley's petition asserted a negligence claim against RGSC under the Texas Tort Claims Act, and RGSC joined the individual defendants in filing a motion to dismiss Bagley's claims for failure to serve an expert report. Section 74.351(b) provides that, in the absence of a timely served expert report, and on the defendant's motion, the court "shall" enter an order that (1) "awards to the affected physician or

---

[9] Because the question before us is limited to whether the expert-report requirement in section 74.351 is preempted, our analysis and holding also are limited to that section. We express no opinion regarding whether any other section of the TMLA is preempted by section 1983.

health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider," and (2) dismisses the claim "with prejudice to the refiling of the claim." TEX. CIV. PRAC. & REM. CODE § 74.351(b).

During the hearing on the defendants' motion to dismiss, Bagley's counsel announced that Bagley was "nonsuiting the claim against RGSC." Later the same day, Bagley filed an amended petition that deleted his claim against RGSC.

Texas Rule of Civil Procedure 162 provides that a plaintiff may take a nonsuit at any time before introducing all of plaintiff's evidence. TEX. R. CIV. P. 162. However, Rule 162 states that a nonsuit "shall have no effect on any motion for sanctions, attorney's fees or other costs, pending at the time of dismissal, as determined by the court." *Id.*

At the time Bagley nonsuited his claims against RGSC, RGSC had a pending motion to dismiss Bagley's claims for failure to serve an expert report under section 74.351. Section 74.351(b) mandates that, when a plaintiff fails to timely serve an expert report, the court shall dismiss the claim "with prejudice" and shall award reasonable attorney's fees and costs. TEX. CIV. PRAC. & REM. CODE § 74.351(b). In *Villafani v. Trejo*, we held that a motion to dismiss with prejudice and for attorney's fees under the predecessor to section 74.351 was a motion for sanctions that survived a nonsuit, and therefore the defendant could appeal the denial of the motion. 251 S.W.3d 466, 470–71 (Tex. 2008). We noted that removing a defendant's ability to appeal the denial of a motion to dismiss because the plaintiff nonsuits the claim would frustrate the statute's purpose of deterring meritless suits. *Id.*[10]

---

[10] In his brief, Bagley asserts that he nonsuited his claims against RGSC with prejudice. However, nothing in the record suggests that Bagley's nonsuit was a dismissal with prejudice to refiling the claim. *See Aetna Cas. &*

Bagley also argues that RGSC's motion did not expressly request costs or attorney's fees. But RGSC's motion to dismiss was premised on Bagley's failure to comply with section 74.351(b), which requires the trial court to award costs and attorney's fees when a plaintiff fails to comply with the expert-report requirement. TEX. CIV. PRAC. & REM. CODE § 74.351(b)(1). We have previously recognized that certain elements of recovery, such as prejudgment interest, need not be specifically pleaded when recovery is mandated by statute. *See Benavidez v. Isles Constr. Co.*, 726 S.W.2d 23, 25 (Tex. 1987) ("[S]tatutory or contractual interest may be predicated on a prayer for general relief."). Courts of appeals have similarly concluded that a claim for attorney's fees need not be pleaded if fees are mandated by statute. *See, e.g.*, *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App.—Dallas 2009, no pet.) ("*Absent a mandatory statute*, a trial court's jurisdiction to render a judgment for attorney's fees must be invoked by pleadings . . . .") (emphasis added); *State v. Estate of Brown*, 802 S.W.2d 898, 900 (Tex. App.—San Antonio 1991, no writ) (same). The motion to dismiss stated that RGSC was seeking relief under section 74.351(b), and it specifically noted that section 74.351(b) required the court to dismiss the claim and award attorney's fees and costs. Accordingly, we conclude that RGSC's motion to dismiss was a "motion for sanctions, attorney's fees or other costs" that was pending at the time Bagley nonsuited his claims against RGSC. TEX. R. CIV. P. 162. Therefore, RGSC's motion survived Bagley's nonsuit, and RGSC is a proper party to this appeal. Because Bagley's claims against RGSC are health care liability claims, RGSC is entitled to dismissal with prejudice and an award of reasonable attorney's fees and costs, as provided by section 74.351(b).

---

*Sur. Co. v. Specia*, 849 S.W.2d 805, 806 (Tex. 1993) ("Subject to certain conditions, a plaintiff who takes a nonsuit is not precluded from filing a subsequent suit seeking the same relief.").

**D. We remand claims against the individual defendants in the interest of justice.**

Because section 74.351 mandates dismissal with prejudice, a determination that a claimant failed to serve the required expert report in a health care liability claim ordinarily results in rendition. *See, e.g.*, *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 367 (Tex. 2019) (reversing the lower court's holding that a plaintiff's claims were not HCLCs and rendering judgment in the hospital's favor because the plaintiff did not serve an expert report); *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 763 (Tex. 2014) (remanding for the trial court to dismiss the case and award attorney's fees and costs where plaintiff did not serve an expert report because plaintiff thought the claim was not an HCLC). However, we have broad authority to remand a case to the trial court when justice so requires. TEX. R. APP. P. 60.3; *see, e.g.*, *Boyles v. Kerr*, 855 S.W.2d 593, 603 (Tex. 1993) ("We have broad discretion to remand for a new trial in the interest of justice where it appears that a party may have proceeded under the wrong legal theory."). The case for remand is especially compelling in cases where, as here, we have substantially clarified the law. *See Hamrick v. Ward*, 446 S.W.3d 377, 385 (Tex. 2014) (remanding in the interest of justice "in light of our clarification of the law"); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 26 (Tex. 1994) (remanding because the Court's opinion represented a "substantial clarification" of the law).

In this case, Bagley's failure to serve the requisite expert reports was not a mere error in interpreting section 74.351. Rather, our conclusion that an expert report was required in this case turns on a previously unaddressed preemption question. Because our decision today substantially clarifies that novel issue, we will remand Bagley's claims against the individual defendants to the

trial court and direct the trial court to provide Bagley an additional sixty days to comply with section 74.351.

### III. Conclusion

We agree with the court of appeals that all of the causes of action Bagley asserted in the trial court are health care liability claims under the TMLA. But the court of appeals erred in concluding that 42 U.S.C. § 1983 preempts the TMLA's expert-report requirement. We hold it does not, and we therefore reverse the court of appeals' judgment and remand the case to the trial court. On remand, the trial court shall dismiss the claims against RGSC with prejudice, award RGSC reasonable attorney's fees and costs as provided in section 74.351(b), and provide Bagley an additional sixty days to satisfy section 74.351's expert-report requirement in his claims against the remaining defendants.

_____
Rebeca A. Huddle
Justice

**OPINION DELIVERED**: April 16, 2021

22